# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2825

_____

MSK EyEs LTD;                                  *
Muhannah S. Kakish,                            *
                                               *
         Plaintiffs – Appellants,              *
                                               *    Appeal from the United States
         v.                                    *    District Court for the District
                                               *    of Minnesota.
Wells Fargo Bank, National                     *
Association,                                   *
                                               *
         Defendant – Appellee.                 *


_____

Submitted: May 12, 2008
Filed:  November 3, 2008

_____

Before LOKEN, Chief Judge, BYE, and COLLOTON, Circuit Judges.

_____

BYE, Circuit Judge.

MSK EyEs, LTD (MSK) and its founder, Muhannah S. Kakish (Kakish), appeal from an order of the district court granting summary judgment to Wells Fargo Bank (Wells Fargo). MSK and Kakish (Appellants) brought an action against Wells Fargo on a myriad of claims arising from their banking relationship, including: breach of contract, credit defamation, business disparagement, defamation, interference with prospective business advantage and economic expectancy, violation of the Minnesota

Garnishment Statute, and negligence. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I

This case has a lengthy, and somewhat complicated, factual background. We recite it below, as simply and briefly as possible.

A. The Banking Relationship

Kakish incorporated MSK in the state of Minnesota in October 2000 to develop a chain of retail eyeware stores. Kakish is the founder, president, chairman of the board, and majority shareholder of MSK. MSK originally aspired to open fifty retail stores in five years and 495 stores in ten years but has yet to open one store.

In April 2001, MSK signed a promissory note on a $35,000 loan from Wells Fargo. Kakish and his brother, Raed Kakish (Raed), personally guaranteed the MSK loan. In June 2001, Wells Fargo dishonored a number of checks drawn on the MSK account – totaling in excess of $40,000 – because it had not yet deposited the funds into MSK's checking account. According to Appellants, Wells Fargo led them to believe the loan was processed when, in fact, it was not. When the third parties contacted Wells Fargo regarding the dishonored checks, a loan officer made disparaging remarks about Kakish's qualities as a businessman and suggested MSK was a shady operation. As a result of the injury Wells Fargo allegedly inflicted on its reputation, MSK claims it lost "several lucrative business opportunities" and began to incur financial difficulties. MSK overdrew its Wells Fargo checking account, causing checks issued to be returned without payment. Within three months, MSK defaulted on the loan.

B. Previous Litigation

Prior to the current litigation, the parties were involved in two relevant lawsuits in the state of Minnesota, one in Ramsey County and one in Hennepin County. In the first suit, filed on November 2, 2001, in Ramsey County, Wells Fargo sought to collect overdraft charges on the MSK checking account. In the second suit, filed one week later in Hennepin County, Wells Fargo sought to recover the outstanding principal, interest and attorneys' fees related to the defaulted MSK loan. We first address the Hennepin County litigation.

1. Hennepin County Litigation

On November 9, 2001, Wells Fargo sued MSK, and Kakish and Raed as guarantors, in Hennepin County court to recover the outstanding principal, interest and attorneys' fees related to the defaulted MSK loan. In response, Appellants asserted counterclaims against Wells Fargo for breach of contract, deceptive and unlawful trade practices, libel and slander. Wells Fargo and Appellants settled the Hennepin County litigation on July 11, 2002, pursuant to a document entitled Mutual Release. Raed was not a party to this settlement.

The Mutual Release provides, in relevant part, in consideration for a $1,000 payment from Kakish and the release of all claims asserted by Appellants against Wells Fargo,

> Wells Fargo does hereby release and forever discharge Muhannah S. Kakish . . . of and from each and every claim, demand, liability and cause of action . . . which Wells Fargo ever had, presently has or claims to have against MSK EyEs Ltd., Muhannah Kakish or his agents, their representatives, successors or assigns . . . that relate in any way to Wells Fargo's April 5, 2001 claims against MSK EyEs, Ltd. pursuant to a promissory note dated April 5, 2001 in the original principal amount of

-3-

$35,000 and the personal guaranty of Muhannah S. Kakish dated April 5, 2001 guarantying the obligations of MSK EyEs, Ltd. to Wells Fargo.

Wells Fargo did not release its claims against MSK or Raed, as a guarantor. According to Wells Fargo, it intentionally did not release MSK because a release of the underlying loan may have jeopardized its ability to obtain payments from Raed as a personal guarantor.

The parties stipulated the terms of the settlement were confidential and not to be disclosed to anyone except, among others, "the corporate directors, officers or shareholders of Wells Fargo and MSK EyEs Ltd." The parties further agreed not to comment on the resolution of their disputes if contacted by third parties, other than to say "the parties in good faith disputed their liabilities thereunder and the matter was resolved by mutual release." Following the settlement, Wells Fargo posted a note on the MSK account that stated in all capitalized letters: "DO NOT GIVE ANY INFORMATION ON THIS CUSTOMER OUT TO ANYONE, IF ANY CALLERS CLAIM TO BE CUSTOMER PLEASE REFER THEM TO [AN OFFICER] RIGHT AWAY!!!"

Pursuant to a stipulation signed by Wells Fargo and Appellants, the Hennepin County District Court dismissed all claims between the parties with prejudice on July 15, 2002. The parties acknowledged the stipulation did not constitute a waiver of Wells Fargo's causes of action against Raed or an agreement to dismiss Wells Fargo's claims against Raed. Raed ultimately defaulted in the Hennepin County litigation, and the court entered a judgment against him in the amount of $54,349.26. In June 2003, Wells Fargo agreed to vacate the judgment, and Raed agreed to pay $3,200 toward the MSK loan in twenty-one monthly payments of $150 from July 15, 2003, until March 15, 2005. Wells Fargo and Raed further agreed the full outstanding balance on the MSK loan would immediately become due and payable if Raed defaulted on his payments.

-4-

Wells Fargo maintained the MSK account as active on its books, credited each settlement payment, and adjusted the outstanding balance accordingly. According to Wells Fargo, the MSK account remained active until the bank received Raed's final settlement payment in March 2005. Wells Fargo claims it sent MSK monthly statements detailing the outstanding balance, interest accrued, and payments received from July 2002 until early 2005. Kakish acknowledges receiving statements from May 2004 onward, but disputes receiving any before that time.

### 2. Ramsey County Litigation

Meanwhile, despite resolving the Hennepin County litigation, neither MSK nor Kakish filed an answer to Wells Fargo's complaint in the Ramsey County collection action for overdraft charges on the MSK checking account. On October 14, 2002 – after Wells Fargo, Kakish and MSK settled the Hennepin County litigation and executed the Mutual Release – Wells Fargo requested a default judgment in the Ramsey County litigation against only MSK, because the checking account was only in MSK's name. On November 4, 2002, the Ramsey County District Court entered judgment against MSK in the amount of $1,634.02. MSK never challenged or appealed the Ramsey County judgment. Between June 13, 2003, and June 5, 2006, Wells Fargo served six garnishment summons on Community First National Bank (Community First), another bank where MSK kept an account. Wells Fargo collected a total of $248.13 towards the Ramsey County judgment.

## C. Disputed Monthly Statements & Account Information

Leroy Miller (Miller) is Kakish's domestic partner, who cohabitated with Kakish at times. Miller invested in MSK, served on its board of directors, and allowed MSK to operate out of his property. He is also the sole owner, director, and employee of Leroy Miller Design, Inc. On August 18, 2004, Leroy Miller Design

-5-

voluntarily petitioned for Chapter 7 Bankruptcy and reported owning only a 0.6% interest in MSK.

In early 2004, Miller had power of attorney for Kakish during the several months Kakish was out of the country. Miller, who was a board member, opened MSK's mail while Kakish was away. At this time, Miller noticed Wells Fargo was sending MSK statements, which referenced an outstanding balance as well as garnishment notices Wells Fargo served on Community First.

In September 2004, Miller contacted Wells Fargo regarding the MSK account. A Wells Fargo officer told Miller he needed signed authorization before the bank could provide him any information regarding the MSK account. Miller informed Kakish. Kakish wrote a letter to Wells Fargo, dated September 20, 2004, stating: "I hereby authorize Wells Fargo Bank to release information relating to MSK EyEs Ltd. and/or Muhannah S. Kakish and related accounts to Leroy Miller Design Inc." Miller then faxed Wells Fargo the following request on the company letterhead of Leroy Miller Design:

> Please provide a reference for MSK EyEs Ltd. and/or Muhannah Kakish. A release for the information should be on file at this time. Please fax information to Leroy Miller Design, Inc.

On October 11, 2004, Wells Fargo faxed the following information to the fax number provided by Miller: the current balance ($31,750), opening balance ($35,000), opening date (April 5, 2001), interest rate (7.75%), maturity date (July 31, 2001) and the amount of monthly payments ($150). Wells Fargo included the following disclaimer:

> By accepting this information, you warrant that receipt by you is lawful, you agree that it will not be disclosed to anyone else or used in an unlawful manner, you acknowledge that its completeness and accuracy

is not guaranteed, it may not disclose the entire relationship of the customer with the bank and is subject to change without notice, and you agree to indemnify and hold the bank harmless against all loss resulting from providing this information to you.

Wells Fargo is not responsible for the information included in this fax being viewed by persons other than the intended recipient upon printing at this fax number.

At the time Miller received the requested information, Leroy Miller Design had already filed for Chapter 7 bankruptcy and, thus, Miller was personally unable to invest additional funds in MSK. Miller stated in his deposition the only impact the receipt of this information had on him was to dampen his enthusiasm to seek new investors for MSK. He stated he did not know whether anyone new would have invested in MSK had Wells Fargo not disclosed the above information to him.

After Miller received the account information from Wells Fargo, Kakish and Miller told other individuals – including directors, shareholders, consultants and potential investors in MSK – about the garnishment proceedings, which resulted from the Ramsey County litigation. They volunteered also that Wells Fargo continued to send MSK statements regarding the $35,000 loan, and was attempting to collect the debt. Appellants allege, as a result of their self-publication of Wells Fargo's actions against them, they have incurred damages in excess of $4.2 million dollars in lost profit.

D. Present Litigation

Appellants commenced this action against Wells Fargo alleging: credit defamation, business disparagement, defamation, interference with prospective business advantage and economic expectancy, negligence, and violation of the

Minnesota Garnishment Statute.[1]  Wells Fargo moved for, and the district court granted, summary judgment on all claims.  This appeal followed.

II

Appellants' claims are based on three primary contentions: (1) Wells Fargo improperly obtained the Ramsey County default judgment and garnished funds from Community First in violation of the Mutual Release; (2) Wells Fargo inaccurately maintained the MSK credit-line account on its books because MSK had been relieved from its obligation to pay the debt pursuant to the Mutual Release; and (3) Wells Fargo wrongfully communicated MSK's account information to Leroy Miller Design. The district court dismissed all claims premised on the first contention with prejudice, concluding it lacked jurisdiction because the claims were barred under the Rooker-Feldman[2] doctrine.  The district court granted summary judgment to Wells Fargo on the surviving claims of breach of contract, defamation and credit defamation, business disparagement, tortious interference with prospective economic advantage, and negligence as they related to the second and third contentions.  The court also granted Wells Fargo summary judgment on the claim it violated the Minnesota Garnishment Statute, Chapter 571.

A. Rooker-Feldman Doctrine

The Rooker-Feldman doctrine is applied to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284

---

[1]Specifically, they allege violations of Minn. Stat. §§ 571.76, 571.90 (2000).

[2]D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983); Rooker v. Fid. Trust Co., 263 U.S. 413 (1923).

(2005). The doctrine does not apply to cases that raise independent issues. See Riehm v. Engelking, 538 F.3d 952, 965 (8th Cir. 2008). The fact that a judgment was entered on a party's default does not alter the applicability of the Rooker-Feldman doctrine. Fielder v. Credit Acceptance Corp., 188 F.3d 1031, 1035 (8th Cir. 1999).

The Rooker-Feldman doctrine does not bar Appellant's claims premised on Wells Fargo's activities in filing the Ramsey County action and in enforcing the resulting judgment. Although Appellants complain of injuries caused by the state court judgment, their claims do not seek review and rejection of that judgment. They do not challenge the court's issuance of the judgment or seek to have that judgment overturned. We have distinguished claims attacking the decision of a state court from those attacking an adverse party's actions in obtaining and enforcing that decision:

> If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, Rooker-Feldman bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, Rooker-Feldman does not bar jurisdiction.

Riehm, 538 F.3d at 965 (citing Noel v. Hall, 341 F.3d 1148, 1164 (9th Cir. 2003)).

Appellant's claims fall into the latter category because they assert allegedly unlawful conduct committed by adverse parties, which does not require the federal district court to overturn the state court's order. Because the state court's judgment would still be intact even if Wells Fargo breached the Mutual Release by obtaining that judgment, Appellant's breach of contract claims do not seek "review and rejection" of that judgment. Likewise, it is possible to conclude Wells Fargo committed various torts in enforcing the judgment without concluding the judgment itself is invalid. Appellant's claims are independent and not barred by Rooker-

-9-

Feldman because they allege unlawful conduct only "in seeking and executing the [state] order." Riehm, 538 F.3d at 965.

Therefore, the district court erred in concluding it lacked subject matter jurisdiction over this aspect of Appellant's claims. Reversal is not required, however, since we may affirm on any basis supported by the record. Richmond v. Higgins, 435 F.3d 825, 828 (8th Cir. 2006). As discussed infra, summary judgment is appropriate on Appellant's claims arising out of the Ramsey County litigation because they fail on the merits.[3]

B. Standard of Review

We review de novo the district court's determination of state law, its conclusions of law, and its grant of summary judgment and we can affirm on any ground supported by the record. Gamradt v. Fed. Labs., Inc., 380 F.3d 416, 419 (8th Cir. 2004). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates there are no outstanding issues of material fact and the moving party is entitled to judgment as a matter of law. Habib v. NationsBank, 279 F.3d 563, 566 (8th Cir. 2001).

---

[3]The district court erred in dismissing these claims with prejudice based on the Rooker-Feldman doctrine because a district court is generally barred from dismissing claims with prejudice if it concludes subject matter jurisdiction is absent. County of Mille Lacs v. Benjamin, 361 F.3d 460, 464 (8th Cir. 2004). Because we conclude, nevertheless, that summary judgment should be granted in favor of Wells Fargo on these claims, they should be dismissed with prejudice and we are not required to reverse the district court.

-10-

C. Breach of Contract

Appellants argue Wells Fargo breached the Mutual Release by prosecuting the Ramsey County litigation, by maintaining allegedly inaccurate records that reflected a balance owed by MSK, by sending MSK account statements reflecting this balance, and by disclosing the status of the MSK loan to Leroy Miller Design. Under Minnesota law, to prevail on a breach of contract claim, Appellants must show "(1) formation of a contract;[4] (2) performance by [Appellants] of any conditions precedent; (3) a material breach of the contract by [Wells Fargo]; and (4) damages." Parkhill v. Minn. Mut. Life Ins. Co., 174 F. Supp.2d 951, 961 (D. Minn. 2000) (citing Briggs Trans. Co. v. Ranzenberger, 217 N.W.2d 198, 200 (Minn. 1974)).

By the plain language of the Mutual Release, Wells Fargo released only Kakish from liability relating to the $35,000 promissory note. Appellants argue the release of Kakish also released the others because Wells Fargo did not execute a Pierrenger[5]

---

[4]With respect to the first element, Wells Fargo argues the agreement entitled "Mutual Release" does not constitute a contract. It argues Minnesota law does not recognize an affirmative claim for breach of a release, which it claims creates only a defense for the person released and not a duty in the person granting the release. Because this is a novel question of state law on which the Minnesota courts have given us little or no prior guidance, we decline to address this argument.

[5]Pierringer v. Hoger, 124 N.W.2d 106 (Wis. 1963). The Pierrenger release was designed to operate in comparative negligence cases where liability is apportioned between defendants. Frey v. Snelgrove, 269 N.W.2d 918, 922 (Minn. 1978) (en banc).

The basic elements of a Pierringer release are: (1) The release of the settling defendants from the action and the discharge of a part of the cause of action equal to that part attributable to the settling defendants' causal negligence; (2) the reservation of the remainder of plaintiff's causes of action against the nonsettling defendants; and (3) plaintiff's agreement to indemnify the settling defendants from any claims of

-11-

release, which specifically preserves claims against the remaining defendants and indemnifies the released defendants. "When a settlement agreement does not contain a *Pierringer* release . . . the general rule is that the 'release of one alleged tortfeasor will release all others *if* the settlement agreement manifests such an intent, or *if* the plaintiff received full compensation in law or in fact for damages sought against the remaining tortfeasors.'" Johnson v. Brown, 401 N.W.2d 85, 88 (Minn. Ct. App. 1987) (quoting Bixler by Bixler v. J.C. Penney Co., Inc., 376 N.W.2d 209, 214-15 (Minn. 1985)) (emphasis in original).

The rule originates in Gronquist v. Olson, 64 N.W.2d 159 (Minn. 1954), where a married couple defaulted on a promissory note. After a jury found them responsible for the debt, the wife settled part of the debt with the plaintiffs, who then dismissed their action against her before judgment was entered. Her husband argued the agreement discharging her operated to discharge him as well. The Minnesota Supreme Court applied the following rule: where a party "receives a part of the damages from one of the wrongdoers, the receipt thereof not being understood to be in full satisfaction of the injury, he does not thereby discharge the others from liability." Id. at 164. The court stated:

> We believe that the factors determinative of whether a release of one of several joint tort-feasors will operate to release the remaining wrongdoers should be and are: (1) The intention of the parties to the release instrument, and (2) whether or not the injured party has in fact received full compensation for his injury. If we apply that rule, then, where one joint tort-feasor is released, [r]egardless of what form that release may take, as long as it does not constitute an accord and

> contribution made by the nonsettling parties and to satisfy any judgment obtained from the nonsettling defendants to the extent the settling defendants have been released.

Id. at 920 n.1.

-12-

satisfaction or an unqualified or absolute release, and there is no manifestation of any intention to the contrary in the agreement, the injured party should not be denied his right to pursue the remaining wrongdoers until he has received full satisfaction.

Id. at 165; see also Wall v. Fairview Hosp. and Healthcare Servs., 584 N.W.2d 395, 403-04 (Minn. 1998) (applying Gronquist and determining the intent of the parties was not to release their claims against all of the defendants and opining "to hold otherwise would also contradict our strong public policy of encouraging settlement."); Johnson, 401 N.W.2d at 89 (applying Gronquist as "the modern rule" and noting application of a more rigid rule, which released all other tortfeasors in the absence of a Pierringer release, could prevent a plaintiff from being made whole); Luxenburg v. Can-Tex Industries, 257 N.W.2d 804, 807-08 (Minn. 1977) (applying Gronquist and rejecting the proposition that release of one joint tortfeasor automatically discharges the others).

The Mutual Release states Wells Fargo releases only Kakish. The agreement contains no manifestation of any intention to release MSK or Raed from the debt. Where the language of an agreement is clear, courts are to enforce the plain meaning of the agreement. Current Techn. Concepts, Inc. v. Irie Enter., Inc., 530 N.W.2d 539, 543 (Minn. 1995). Futhermore, the terms of the agreement required Kakish to pay only $1,000 toward the defaulted $35,000 loan. Under these facts, there can be no implied release of the other debtors; Wells Fargo was free to pursue the balance of the debt from MSK and Raed. Since Wells Fargo did not release MSK from liability for its debt, it did not breach the agreement by maintaining a record of the debt, continuing to seek payment from Raed, and crediting his payments against MSK's account. Moreover, since the Mutual Release covers only Kakish, Wells Fargo did not breach the contract by initiating and enforcing the Ramsey County default judgment against MSK.

Wells Fargo did agree to keep the terms of the settlement confidential. The information it released to Leroy Miller Design, however, did not disclose the existence of litigation history and did not include the terms of the parties' settlement. Thus, Wells Fargo did not breach the agreement with respect to confidentiality of terms.

With respect to Kakish's claims, Wells Fargo did not break any promise it made to Kakish. The breach of contract allegations made by Appellants relate only to MSK and do not identify any wrong against Kakish in his personal capacity. Kakish has no claim.

Because neither appellant has a viable claim for breach of contract, summary judgment was properly granted to Wells Fargo.

D. Defamation Claims

We next address Appellants' claims for defamation, credit defamation and business disparagement. As the district court recognized, neither party identified facts or legal authority to distinguish the claims as separate. We therefore analyze the three claims under the Minnesota law of defamation.

"In order for a statement to be considered defamatory it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community." Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980) (citing Restatement (Second) of Torts §§ 558-559 (1977); W. Prosser, Handbook of the Law of Torts § 111 at 739 (4th ed. 1971)). Defamation claims require a showing of publication by the defendant to a third party. An exception to the rule applies if the plaintiff is "compelled to publish a defamatory statement to a third person" and "it was foreseeable to the defendant that the plaintiff would be so compelled." Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 888 (Minn. 1986). Under this

exception, which must be cautiously applied, plaintiffs have a duty to mitigate and are required "to take all reasonable steps to attempt to explain the true nature of the situation and to contradict the defamatory statement." Id.

Appellant first allege defamation arising out of Wells Fargo's prosecution and enforcement of the Ramsey County litigation. Appellants allege Wells Fargo defamed them by disclosing to others a debt that had been released. First, to the extent Appellants allege defamation based on Wells Fargo's disclosures made during the Ramsey County litigation, such publication is protected by absolute privilege. Mahoney & Hagberg v. Newgard, 712 N.W.2d 215, 219 (Minn. Ct. App. 2006). Second, to the extent Appellants allege defamation based on Wells Fargo's disclosure of that judgment to Community First, Wells Fargo is protected by the defense of truth. Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 255 (Minn. 1980). Wells Fargo was truthful when it communicated to Community First that it had obtained a judgment against Appellants and was owed money pursuant to that judgment.

Appellants next allege defamation based on two additional communications, both of which disclosed account information and reflected a balance owed by MSK. First are the monthly account statements sent to MSK. Second is the October 11 fax from Wells Fargo to Leroy Miller Design. At the outset, we find neither of these communications defamed Kakish. "Defamatory words, to be actionable, must refer to some ascertained or ascertainable person and that person must be the plaintiffs." Brill v. Minn. Mines, 274 N.W. 631, 633 (Minn. 1937); see Schlieman v. Gannett Minn. Broad., Inc., 637 N.W.2d 297, 306 (Minn. Ct. App. 2001) (holding jury instructions in a defamation action were proper when they required "a false and defamatory statement which actually refers to the plaintiff"). Neither the fax to Leroy Miller Design, nor the MSK monthly account statements refer to Kakish. Consequently, the district court properly granted summary judgment to Wells Fargo on Kakish's claims for defamation, credit defamation and business disparagement.

-15-

We begin with the monthly account statements. The statements were mailed to the attention of MSK only. MSK therefore relies on the theory of compelled disclosure to meet the publication requirement. Although the record does not contain any written communications or even meeting minutes demonstrating MSK's self-publication, Kakish's deposition testimony is he informed MSK's board of directors and at least one investor, who was not on the board, that Wells Fargo was claiming MSK owed a debt. The record does contain unsworn letters from MSK board members and investors, who stated they were no longer willing to invest in MSK when they found out Wells Fargo was pursuing MSK for the balance on the promissory note, a matter Kakish had told them was settled.[6] The letters reflect deep distrust of Kakish and the authors' conclusions Kakish must have lied to them about the settlement.

We agree with the district court MSK was not compelled to self-publish to investors that Wells Fargo was pursuing it for the defaulted loan. First, Wells Fargo was not pursuing MSK for the balance of the loan; it was keeping the defaulted loan on its books until the conditions of its settlement with Raed were satisfied. As stated in the background section, Wells Fargo had specifically retained its right to pursue Raed for the full balance of MSK's loan in the event Raed missed any of his settlement payments. There is no evidence in the record that Wells Fargo demanded payment from MSK or suggested it would take legal action against MSK to recover the balance owed. Second, Wells Fargo's Hennepin County action against MSK for the debt was dismissed with prejudice and, by law, Wells Fargo could no longer collect from MSK. Third, Wells Fargo could not have foreseen MSK would feel compelled to inform its investors of actions Wells Fargo was not taking.

---

[6]We note unsworn statements are ordinarily inadmissible hearsay and do not constitute competent evidence that can be considered under Fed. R. Civ. P. 56(e). However, "otherwise inadmissible documents may be considered by the court if not challenged." 10A Charles Alan Wright et al., Federal Practice & Procedure § 2722, at 384-85 (3d ed. 1998).

With respect to the inclusion of the debt on MSK's monthly account statements, Appellants argue that information was material to investors because it related to the financial strength and creditworthiness of the company. We disagree. The information about the defaulted loan was irrelevant to the actual financial strength and creditworthiness of MSK; Wells Fargo did not demand payment from MSK and gave MSK no reason to believe it intended to take legal action to recover the debt. Thus, no reasonable investor would have needed to know about what was, at base, a Wells Fargo accounting issue. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (adopting standard that for information to be material, such that it must be disclosed to investors, there must be a "substantial likelihood" that the disclosure will be "viewed by the reasonable investor" as "significantly alter[ing] the 'total mix' of information made available"); Robbins v. Moore Med. Corp., 894 F. Supp. 661, 672-73 (S.D.N.Y. 1995) (granting summary judgment on the issue of materiality where reasonable minds could not differ as to whether the undisclosed facts would be important to a reasonable investor). Again, Wells Fargo could not have foreseen MSK would feel compelled to inform its investors of the method of Wells Fargo's accounting when it had no effect on the finances of MSK.

Furthermore, even if MSK were compelled to disclose the format of its monthly statements to investors, it had a duty to mitigate. The law required MSK to "take all reasonable steps to attempt to explain the true nature of the situation." Lewis, 389 N.W.2d at 888. When disclosing the nature of Wells Fargo's accounting of the defaulted loan, MSK was required to explain it had settled all its debts with Wells Fargo, Wells Fargo dismissed its claims against MSK with prejudice and was not threatening any further litigation over the loan. While the board and investor statements indicate Kakish did inform them of the settlement, they also show MSK falsely led them to believe Wells Fargo was, nevertheless, pursuing MSK for the debt. The law does not allow MSK to create its own claims in this fashion. See id. (warning the danger in recognizing self-publication is in discouraging plaintiffs from mitigating damages).

We next turn to the October fax Wells Fargo sent to Leroy Miller Design disclosing the account information of MSK. We find the fax to be absolutely privileged because of MSK's express authorization. In Minnesota, "defamatory statements are absolutely privileged if the plaintiff consents to their publication." LeBaron v. Minn. Bd. of Pub. Def., 499 N.W.2d 39, 42 (Minn. Ct. App. 1993) (citing Restatement (Second) of Torts § 583 (1977)); see also Otto v. Charles T. Miller Hosp., 115 N.W.2d 36, 40 (Minn. 1962) (quoting Restatement (Second) of Torts § 583 (1977)). As the Restatement indicates, "[i]t is not necessary that the other know that the matter to the publication of which he consents is defamatory in character. It is enough that he . . . have reason to know that it may be defamatory." Restatement (Second) of Torts, § 583 cmt. d. By MSK's own admission, Wells Fargo sent it monthly account statements containing information about the defaulted loan balance for at least five months before MSK authorized Wells Fargo to release its account information to Leroy Miller Design. At the time MSK consented to the release, therefore, it had reason to know the account information disclosed to Leroy Miller Design by fax would be the same as in the monthly account statements.

Because the fax to Leroy Miller Design was made with the express authorization of MSK, Wells Fargo is absolutely privileged against MSK's defamation claim. Summary judgment was appropriately granted.

E. Tortious Interference

Appellants also bring claims for tortious interference with prospective economic advantage arising from Wells Fargo's enforcement of the Ramsey County judgment and the October 11 fax to Leroy Miller Design. Claims arising out of purported defamatory statements, such as tortious interference, are properly analyzed under the law of defamation. Mahoney & Hagberg v. Newgard, 729 N.W.2d 302, 309-10 (Minn. 2007). "Absolute privilege also bars claims sounding in defamation – that is claims where the injury stemmed from and grew out of the defamation." Id.;

see, e.g., Pinto v. Internationale Set Inc., 650 F. Supp. 306, 309 (D. Minn. 1986) ("[I]n Minnesota, a plaintiff cannot elude the absolute privilege by relabeling a claim that sounds in defamation.") Appellants' claims for tortious interference with prospective economic advantage fail for the same reasons their defamation claims fail.

F. Negligence

Appellants contend Wells Fargo negligently collected, investigated and retained inaccurate data about MSK. The district court concluded Appellants' negligence claim stemmed from the allegedly defamatory communications, and granted summary judgment to Wells Fargo on the same basis as the defamation claims. Appellants urge us to find their negligence claims are based on more than just the defamatory communications; they contend the claims are based on Wells Fargo's negligent handling of information contained in its internal accounting systems and its billing systems. We are not persuaded.

Negligence requires "(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury." Engler v. Ill. Farmers Ins. Co., 706 N.W.2d 764, 767 (Minn. 2005). We know of no authority holding a company has a duty to its clients to maintain accurate internal data. Furthermore, Wells Fargo's retention of inaccurate data was not the proximate cause of Appellants' alleged injury; if anything, disclosure of the information to third parties produced the alleged injury. Like the district court, we conclude Appellants have inappropriately dressed their defamation claim in the garb of negligence. Summary judgment was properly granted in favor of Wells Fargo on the negligence claim.

## G. Garnishment

Appellants contend Wells Fargo violated the Minnesota Garnishment Statute by acting in bad faith when it garnished MSK's account at Community First. Under the Minnesota Garnishment Statute, they argue the garnishment is therefore void. Minn. Stat. § 571.90 (2000). Appellants also argue Wells Fargo violated the statute by failing to provide the required $15 fee to the garnishee, Community First. Id. § 571.76.

The district court properly found Wells Fargo's efforts to collect the Ramsey County judgment through garnishment was legal and, therefore, not in bad faith.[7] With respect to Appellants' second argument, pertaining to the Section 571.76 violation, Appellants do not have standing to enforce Section 571.76, which requires Wells Fargo to make payment to Community First.

The district court properly granted summary judgment to Wells Fargo on MSK's garnishment claims.

## H. Motion to Amend

Appellants argue the district court committed reversible error by not expressly ruling on its motion for leave to file a second amended complaint. A denial of a motion to amend is reviewed for abuse of discretion. Thomas v. Corwin, 483 F.3d 516, 532 (8th Cir. 2007). It is not an abuse of discretion for the district court to implicitly deny a motion for leave to amend by entering final judgment inconsistent with the relief sought in the motion. Cohen v. Curtis Pub. Co., 333 F.2d 974, 977 (8th Cir. 1964).

---

[7]Appellants' only allegation of bad faith was its argument Wells Fargo breached the mutual release by collecting the Ramsey County judgment.

We find it was not an abuse of discretion for the district court to deny Appellants' motion to amend. Appellants brought their motion nearly three months after the Rule 16 deadline for amendment, nearly two years after the action was commenced, and after Appellants were notified Wells Fargo was moving for summary judgment. See Baptist Health v. Smith, 477 F.3d 540, 544 (8th Cir. 2007) (holding "there is no absolute right to amend and a court may deny the motion based upon a finding of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies in previous amendments, undue prejudice to the non-moving party, or futility.")

## III

Accordingly, we affirm the district court's grant of summary judgment to Wells Fargo.

_____