HOME SHOW TOURS, INC., an Illinois Corporation d/b/a Qchomeshow.Com a/k/a Quadcityhome Show.com, Plaintiff,

v.

QUAD CITY VIRTUAL, INC., an Iowa Corporation, d/b/a QCFSBO.com a/k/a QCFSBO, and Symmetry Mortgage Corp., an Iowa Corporation, Defendants.

No. 3:08–CV–00127–JEG.

United States District Court,
S.D. Iowa,
Davenport Division.

March 23, 2011.

Mark R. Fowler, Gomez May Cartee & Schutte Ian J. Russell, Lane & Waterman LLP, Davenport, IA, for Defendant.

James S. Zmuda, Califf & Harper PC, Moline, IL, for Plaintiff.

## ORDER

JAMES E. GRITZNER, District Judge.

Before the Court are motions for summary judgment brought by Defendant Quad City Virtual, Inc. (QCFSBO) and Defendant Symmetry Mortgage Corp. (Symmetry), which Plaintiff Home Show Tours, Inc. (Home Show) resists. The matter came on for hearing on December 13, 2010. Attorney James Zmuda (Zmuda) represented Home Show; Attorney Ian Russell represented QCFSBO; and Attorney Mark Fowler represented Symmetry. The matter is fully submitted and ready for disposition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Since 1999, QCFSBO co-founders Rebecca Banerjee (Banerjee) and Sam Banerjee have owned and operated QCFSBO.com, a for sale by owner (FSBO) real estate website that advertises FSBO real estate listings and other real estate-related services. Troy Vavrosky (Vavrosky) owns Home Show, which also operates a FSBO website, QCHomeshow.com (aka QuadCity Homeshow.com). Both QCFSBO and Home Show serve the Quad City Area.[1] QCFSBO has a strict policy prohibiting parties who list with QCFSBO from co-listing with a realtor or with any other real estate website; Home Show has no such policy.

Symmetry, which is primarily owned by Greg Franich (Franich) and Erin Franich, sells and services home mortgages. Ap-

---

1. "The Quad City Area is made up of the [Mississippi] riverfront cities of Davenport and Bettendorf in Iowa, and Moline, East Moline, and Rock Island in Illinois. Other communities include Silvis and Port Byron, in Illinois—LeClaire and Eldridge in Iowa." Quad City Convention and Visitors Bureau, *2011 Visitors Guide Quad Cities* 4 (2011), *available at* http://editions.magsbyme.com/ebook/ebook.php?id=10013554#/4.

proximately twenty-five percent of Symmetry's mortgage services go to FSBO buyers.[2] Symmetry and QCFSBO lease adjacent office space in a duplex building owned by Franich Properties, LLC, which, in turn, is wholly owned by Greg and Erin Franich.[3]

On June 18, 2003, QCFSBO and Symmetry entered into a written mutual advertising/referral agreement (the QCFSBO–Sym Agreement), under the terms of which QCFSBO would "not refer to any other mortgage service provider other than Symmetry" and Symmetry would "not refer a seller or someone that wishes to advertise anywhere but QCFSBO." Franich Dep., QCFSBO's App. 83, ECF No. 37–3. QCFSBO and Symmetry did not exchange money for the QCFSBO–Sym Agreement. The terms of the QCFSBO–Sym Agreement did not require Symmetry customers to use QCFSBO's services nor did it require QCFSBO's customers to use Symmetry's services.[4]

Franich is a licensed real estate broker and a member of the Quad City Board of Realtors and, as such, has access to the Quad City Area Multiple Listing Service (MLS). Symmetry admits that it shared certain MLS information with QCFSBO approximately once every three-to-four months but that the information is limited to (1) verbal verification as to whether or not a current or potential client of QCFSBO's is listed with a realtor on the MLS, and (2) gross marketing statistics to assist in the preparation of general marketing information for joint seminars with QCFSBO and others.[5] Symmetry denies ever advising QCFSBO when an MLS listing was about to expire so as to give QCFSBO a competitive advantage.[6]

In 2002 or 2003, QCFSBO entered into a sponsorship-advertising package (sponsorship package) with Clear Channel Communications (Clear Channel), which operates several radio stations in the Quad City Area.[7] The sponsorship package gave QCFSBO exclusive sponsorship rights for two Clear Channel broadcast shows, "the Top 40 Countdown Show" and "the Jazz Patio." Clear Channel's sponsorship packages give sponsors like QCFSBO semi-exclusive advertising rights within that sponsor's industry category, in QCFSBO's case, the real estate marketing industry, to advertise on the broadcast station during the airing of the sponsored show.

---

2. In 2009, Symmetry financed between thirty and forty of the estimated 1357 FSBO transactions that occurred in Scott and southern Clinton Counties in Iowa.

3. Symmetry's and QCFSBO's offices have separate entrances and share no common interior space.

4. Home Show denies that such is the extent of the advertising agreement and relationship between Symmetry and QCFSBO arguing that although Symmetry and QCFSBO are not required to refer respective clients to one another, neither QCFSBO nor Symmetry will refer clients to any other business or post advertisements from any other business on their websites.

5. Home Show admits it cannot confirm or deny how many times or how often Symmetry has shared certain MLS information with QCFSBO.

6. Home Show denies that Symmetry's sharing of MLS information is limited to the Defendants' proffered reasons noting that (1) Franich testified that QCFSBO employee Michelle Diehn requested listing date information from Symmetry and that Franich's assistant has provided QCFSBO with various documents; and (2) Banerjee testified that Franich has shared MLS information with QCFSBO. However, Home Show concedes it cannot verify the extent to which Symmetry shares MLS information with QCFSBO.

7. The parties interchangeably refer to the Quad City Radio Group (Radio Group) and Clear Channel. For consistency, the Court refers to Clear Channel.

QCFSBO's sponsorship package did not prevent other companies within the real estate marketing industry, such as Home Show, from buying their own exclusive advertising packages or from advertising during the same time slot on other Clear Channel-operated stations not broadcasting the QCFSBO-sponsored show. Home Show asserts that it first learned of Clear Channel's exclusive sponsorship policy after QCFSBO purchased its sponsorship-advertising package.

On September 30, 2008, Home Show filed a complaint against QCFSBO alleging claims for libel per se, libel per quod, false light, and violations of the Lanham Act, 15 U.S.C. §§ 1501 et seq. On May 5, 2009, Home Show amended its complaint adding a claim for intentional interference with business relationships against QCFSBO, and on October 7, 2009, Home Show amended its complaint a second time naming Defendant Symmetry in Count VI and therein adding an anti-trust claim against QCFSBO and Symmetry under the Sherman Act, 15 U.S.C. §§ 1, 2.

QCFSBO moves for summary judgment on all six counts, and Symmetry moves for summary judgment on Count VI, asserting that Home Show has produced no evidence to support its claims or to demonstrate it has been damaged by the Defendants' alleged conduct. Home Show resists, arguing that it has established multiple questions of material fact with respect to each of its claims.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates there are no outstanding issues of material fact and the moving party is entitled to judgment as a matter of law. *MSK EyEs Ltd. v. Wells Fargo Bank, NA,* 546 F.3d 533, 540 (8th Cir.2008). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.,* 462 F.3d 1015, 1018 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Home Show "may not merely point to unsupported self-serving allegations, but must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor, without resort to speculation, conjecture, or fantasy." *Reed v. City of St. Charles, Mo.,* 561 F.3d 788, 790–91 (8th Cir.2009) (internal quotations and citations omitted). "In sum, the evidence must be 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

### B. Counts One through Four

Home Show does not specifically identify in the body of its complaint those statements that form the bases of its Lanham Act, libel, and false light claims.[8] Instead, Home Show's second amended complaint obliquely outlines the statements that form the bases of its claims, stating,

QCFSBO has published and continues to publish false and defamatory statements and information concerning QCHomeshow on its website, www.qcfsbo.com and has made and continues to make false statements of fact about QCFSBO and

---

8. At the commencement of the hearing on the pending motions, the Court specifically advised of its concern that the record was not entirely clear regarding which statements Plaintiff considered actionable and encouraged some effort to clarify those matters. No further clarification was provided.

QCHomeshow.com and/or claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive customers, *including the statements and information described in correspondence from counsel for QCHomeshow to QCFSBO attached to this Second Amended Complaint as Exhibit A.*

Second Am. Compl. ¶ 7, ECF No. 28 (emphasis added). Exhibit A to Home Show's second amended complaint (Exhibit A) is comprised of a cease and desist letter from Home Show's attorney, Zmuda, to QCFSBO and sixteen screenshots from QCFSBO.com. The screenshots contain Home Show's cryptic annotations identifying Home Show's objections and why Home Show believes those statements are actionable. Ex. A, Second Am. Compl., ECF No. 28–1.

██ The Court is never obligated to go beyond a party's efforts and sift the record for facts to support a claim. *See Libel v. Adventure Lands of Am., Inc.,* 482 F.3d 1028, 1032 (8th Cir.2007) ("Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or defense."); *Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1113 (8th Cir.2004); *White v. McDonnell Douglas Corp.,* 904 F.2d 456, 458 (8th Cir.1990) ("A district court is not required to speculate on which portion of the record a nonmoving party relies ..." (quoting *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989))). It appears the only reasonable way to summarize the claimed harmful and actionable statements is to set forth the notations in Exhibit A. The following list includes a description of the QCFSBO.com web page link, the challenged statement(s) therein set out in quotation marks, and Home Show's (quoted) annotations set out in italics:

1. A screenshot of the top portion of the "Most Popular & Successful FSBO Website in QCA" link:

 a. Bullet point links to other QCFSBO®com web pages, including: "Best Exposure in the QCA" and "FSBO Home Sales in QCA."

 i. *Untrue and Unproven*

 b. "Through the years countless successful sellers and buyers have learned that the place to go to sell or buy FSBO homes is the one and only 100% FSBO website of the Quad Cities ... QCFSBO®.com. From their repeated success we were not only able to grow into the most successful FSBO website in the Quad Cities but indeed one of the most successful FSBO websites in the United States."

 i. *Untrue and Unproven*

 c. "However, our customers continue to get mailings from far smaller local websites claiming to provide more exposure than QCFSBO®.com! So we decided to compile a [sic] listing data from these other local websites on a weekly basis. The information we gathered is quite revealing but you are probably not going to be surprised by these statistics if you are a regular visitor to our website. The graph shown below is a comparison of listing data between QCFSBO®.com and #2 website in the QCA. We have not included other even smaller websites because their listing volume is statistically insignificant for comparison purposes."

 i. *Statement attempts to put qchomeshow.com in a false light.*

 d. A graph entitled, "QCFSBO®.com-#2 Website in QCA," depicting the "cumulative

listing volume" for 41 weeks in 2007 for the two websites and portraying QCFSBO as having a higher listing volume. Below the graph is the statement: "QCFSBO is the preferred website for more than 2 out of every 3 FSBO Sellers in the QCA."

i. *Graph is inaccurate, misleading, and completely untrue.*

2. A screenshot of the top portion of the "Best Exposure in the QCA" link:

a. "Visitors to QCFSBO®.com Bring Unparalleled Exposure to Your Property."

i. *Untrue and Unproven.*

b. A box containing three related bar graphs captioned "Network Traffic on QCFSBO®.com." The bar graphs depict the (1) numbers of pages, files, and hits; (2) visits and sites; and (3) kilobytes, found on QCFSBO.com. Below the graph is a statement disclosing that the statistics were generated by "Third Party Software."

i. *Software used is "Trend" Software not completely accurate [and] is easily manipulated, unreliable, [it] over-exaggerates the hit count and should not be used as "hit" count advertising. The software programmer even stated this to be true.*

3. An enlarged screenshot of a lower portion of the "Best Exposure in the QCA" link:

a. A chart containing the IP addresses of the visitors and detailing the number of hits, files, kilobytes, and visits to the QCFSBO®.com website.

i. *qcfsbo.com posts ip addresses. (Not a good practice as it could lead to a security issue for those who have the ip address).*

b. A section captioned, "Our Position on Your Privacy Issues," which, in pertinent part, states: "No individual visitor data is sought or collected by our tracking software. If you are using a broadband service at home, we can log your IP address but your identity is always protected by your service provider. This will be true whether you are visiting our website or sending us a message. We will not seek legal recourse to determine your identity unless you are trying to abuse our network or messaging system. Our sole intent of collecting statistical data here is to provide an overall view of visitors to our website."

i. *They track & know qchomeshow.com's ip—and do use it to keep track of their [sic] visits & messages.*

4. A screenshot of the top portion the "Brick & Mortar Presence in the QCA" link:

a. "QCFSBO®.com—only one with an office in the QCA. We are the only local 100% Internet based professional FSBO company with a real Brick and Mortar presence in the Quad Cities, fully staffed with customer service representative during business hours. Every other web site, except one which is primarily a newspaper operation, is essentially run by one individual or a couple working out of their homes."

i. *Cannot state one (even if another is primarily a newspaper operation). False advertising.*

b. "Benefits of Enterprise Class Phone System & Experienced Customer Service Staff," comparing home-based FSBO businesses to QCFSBO.com's "brick and mortar presence." Stating that QCFSBO.

com's "experienced staff" will promptly handle multiple calls and that calls placed to QCFSBO.com during business hours will be answered. "Even with [a] much smaller customer base, it is almost impossible for home based businesses run by one or two individuals to answer every call coming in during business hours and extremely difficult to return all calls in a timely manner" because "they have to take your pictures, create web pages and maintain their web sites in addition to [the] customer service that you expect and deserve."

i. *Issue # 1:—smaller customer base?*

c. "Unless you are fond of phone tags [sic], you are never going to get the same level of service from home based businesses that you can get from [a] fully staffed professional operation like ours at QCFSBO®.com."

i. *Issue # 2—calls are effectively answered and our clients are very pleased at the level of service we provide them. (Even past clients of qcfsbo.com have commented on how much better service they received from qchomeshow.com[) ].*

d. "While we commend those individuals who do everything by themselves but you, as a customer must suffer as a result of these one-person operations. Unfortunately, there are only so many hours in a day!"

i. *None of the clients at qchomeshow.com suffer—none.*

5. A screenshot of the top portion of the "Most Popular & Successful FSBO Website in QCA" link:

a. "QCFSBO®.com—Most Popular FSBO Destination in the OCA."

i. *Untrue & Unproven.*

b. A chart captioned, "QCFSBO.com vs. # 2 Website in the QCA," providing a 12-week comparison of the listing volumes for "QCFSBO®.com" and "# 2 Website in QCA." QCFSBO.com is portrayed as having a consistently higher listing volume.

i. *Statistics are inaccurate. Qcfsbo.com adds to their count, and reduces the amount of the competitor (qchomeshow).*

6. A screenshot of a middle portion of the "Most Popular & Successful FSBO Website in QCA" link:

a. "Popularity leads to more exposure"

i. *Only one of 'many' factors*

b. Ad box—"QCFSBO®.com—# 1 FSBO Destination in the QCA" and chart—"New Listing Volume–A Recent Snapshot" containing a side-by-side comparison of the FSBO listings for "QCFSBO" and "# 2 Website" during specific weeks.[9]

i. *Statistics are inaccurrate [sic] and qcfsbo.com cannot prove their site to be the # 1 destination (nor the most popular nor the most successful).*

c. A section entitled, "Sold Section—A Caveat Emptor," stating: "Every local website, except QCFSBO® lists FSBO and Realtor listed properties. However, when it comes to listing them on their sold section, they carefully remove all pertinent information so a viewer has no clue as to how many of these sold properties were in fact listed and sold by area Realtors." The Caveat Emp-

---

**9.** This is the same screenshot shown on pages three and four of Exhibit A.

tor section provides several "scenarios" comparing the "nature and content" of the sales displayed in QCFSBO®.com's sold section with those displayed in #2 Website's sold section.

i. *qchomeshow. com sold page shows the property sold either by owner or by realtor. This statement & scenario's [sic] are nothing more than an attempt to deceive viewers. (False advertising).*

7. A screenshot of a middle portion of "Most Popular & Successful FSBO Website in QCA" link:

a. A tabbed chart with links to flow charts that detail how and when a sold property will appear on QCFSBO.com and links to scenarios depicting how and when a sold property is depicted on #2 website.

i. *All the tabs leading to all the scenarios are inaccurate and completely misleading*

8. Lower portion of web page entitled, "Most Popular & Successful FSBO Website in QCA."

a. "Looks Can Be Deceiving" section warning "[t]here are lots of little tricks of the trade to give the 'appearance' of a website with more inventory. If you are comparing websites to decide where to list, you should be aware of these tricks of the trade."

i. *There are no "Tricks."*

b. "When listing several lots in one subdivision with one seller we place all advertised lots in one link.... For some websites though it can mean as many as 20–50 additional listings if they advertise these with individual links. And they do!"

i. *All subdivision are counted as one sold.*

c. "Another trick of the trade is to list properties as both commercial and residential .... [to give] the appearance of a bulked up site."

i. *Commercial properties & lots are also added to the database to enable them to be accessed by the qchomeshow.com search engines. (Not one is listed twice—not one is counted more than once).*

d. "Finally ... The Trust Factor," section, stating, inter alia: "[T]here are companies in the QCA who are boldly falsifying public records. Take this website in Illinois for example. This company is boldly declaring on its website and radio ads that they have been 'successfully helping Quad City sellers advertise their property for sale' since 1999. Where did the year 1999 come from? We can only guess! Could it be because QCFSBO®.com was registered in March, 1999 and they want to show they have been around as long as us? There is, however, one little problem with this story! This website did not exist in 1999! The domain name was not registered until April 28, 2000 and the website was launched long after that."

i. *qcfsbo.com attempts to prove to viewers qchomeshow.com cannot be trusted. The site was ran [sic] as a sold [sic] proprietor (and under a personal domain) in 1999. When the site took off, the owner decided to purchase several domains and move to the next stage[.] The company then incorporated several years later.*

9. A screenshot of the top portion of the QCFSBO®.com home page:

a. "Welcome to QCFSBO®.com Quad Cities' most successful and premier Internet Web site showcas-

ing properties For Sale by Owner (FSBO)."

 i. *Untrue & Unproven*

b. "You will get the best exposure in QCA" and "QCFSBO® provides unparalleled exposure to your properties in the Quad Cities and surrounding areas."

 i. *Untrue & Unproven*

c. Link one: "QCFSBO®.com is the only local fsbo website with a brick and mortar office in the QCA. Customer[s] can visit and conduct their business in our beautiful facility in Bettendorf. We also host educational seminars on our premises for both buyers and sellers. Click on the link below to see how our personnel can help you as a buyer or seller of FSBO properties." Link two: "QCFSBO®.com is the most successful FSBO web site in the Quad City Area . . . We have compiled listing data from QCFSBO® and other local web sites. If you are a regular visitor to our web site, this may not come as a surprise to you."

 i. *These two links take you to more false information.*

10. An enlarged screenshot of the links on left-hand side of QCFSBO®.com home page:

a. "Best Exposure in QCA," and "Most Popular Website in QCA."

 i. *Unproven and Untrue.*

11. The linked "Disclaimer and Legal Notice," [10] which, in pertinent part, states: "Quad City Virtual, Inc. does not accept co-listing of any property on our website. Should you decide to list your property on another website, you must advise us within 24 hours so we can remove your listing from our website. As mentioned above, the monthly fees paid to Quad City Virtual, Inc. will not be refunded."

12. A screenshot of the middle portion of the "Brick and Mortar Presence in QCA" link:

a. "When you are dealing with home based businesses, even little tasks, like returning a yard sign, become a chore and time consuming. If you have to return a sign to QCFSBO®, all you have to do is stop by our office during business hours. Upon return, your sign will be inspected immediately by QCFSBO® office staff. A refund check is issued right away if the sign is returned in a satisfactory condition. Can you expect the same convenience with a home based business? No, you cannot. With one of the home based operation [sic] in Illinois, you need to take the sign to an office in Moline and then wait 7–10 days to receive a refund check in the mail! That's right, 7–10 days!"

 i. *Attempt to make us look bad. Qchomeshow. com actually started the sign deposit years before qcfsbo. com—and prior to their moving in with a mortgage company (Symmetry)—they too had problems with sign returns and were a home based business.*

13. A screenshot of the lower portion of the "Brick and Mortar Presence in QCA" link:

a. "When was the last time you heard or saw any of the 'other guys' advertise on a regular basis?"

 i. *qchomeshow. com advertises frequently on the radio & cable television.*

---

**10.** Three pages contained in Exhibit A contain this same disclaimer language but do not have annotations proffering Home Show's objections to that language.

b. "Again, you do not need to worry about the possibility of playing phone tags [sic] to find your answer. Talk to a 'live' person or simply stop by our office."

 i. *Attempts to slander qchomeshow.*

Second Am. Compl., Ex. A, ECF No. 28–1.

QCFSBO asserts it is entitled to summary judgment on Home Show's claims for Lanham Act violations, libel, false light, and intentional interference because Home Show has produced no evidence QCFSBO made a false statement and Home Show's mere "belief" that statements on QCFSBO.com are false is not enough to avoid summary judgment.

In resistance, Home Show states there are genuine disputes as to (1) whether QCFSBO has cast Home Show in a false light and consequently caused Home Show to suffer damages, and (2) the extent of QCFSBO's exclusive contract with Symmetry.

### 1. Lanham Act Claim [11]

The Lanham Act, 15 U.S.C. § 1125(a)(1), in relevant part, provides,

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

■■■■ "The purpose of this Act is 'to protect persons engaged in commerce against false advertising and unfair competition.'" *Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir.2005) (quoting *Am. Italian Pasta Co. v. New World Pasta Co.*, 371 F.3d 387, 390 (8th Cir.2004)).

To establish a claim for false advertising, [Home Show] must establish the following: 1) [QCFSBO] made false statements of fact about its own product; 2) [QCFSBO]'s statement actually deceived or had the tendency to deceive a substantial segment of its audience; 3) the deception created was material; 4) [QCFSBO] caused the false statement to enter interstate commerce; and [Home Show] has been or is likely to be injured as a result of [QCFSBO]'s alleged false advertisement. Failure to establish any one element of the prima facie case is

---

**11.** In its second amended complaint, Home Show asserts that QCFSBO's actions "violate the Lanham Act, 15 §§ U.S.C. 1051 et seq." In response to QCFSBO's motion for summary judgment, Home Show cites 15 U.S.C. § 1125(a)(1)(B) and asserts that "[u]nder section 43(c) of the Lanham Act, any advertiser or promoter who employs false or misleading representations of fact, which misrepresents the nature, characteristics or qualities of another person's services, shall be liable." Pl.'s Resp. Br. 6, ECF No. 49–1. Section 43(c) of the Lanham Act is the dilution of trademark provision; however, because Home Show alleges unfair competition, not trademark infringement, the Court accepts Home Show's claim as falling under Section 43(a), which is the Lanham Act's unfair competition provision.

fatal to the claim. Under the first element, a statement is false if it is either 1) literally false, or 2) literally true or ambiguous, but renders a false impression when viewed in context.

*Id.* (quotation marks and internal citations omitted). A finding of literal falsity is less-likely supported where "[t]he greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion." *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1183 (8th Cir.1998). "Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false." *Id.*

Under section 43(a), two categories of actionable statements exist: (1) literally false factual commercial claims; and (2) literally true or ambiguous factual claims which implicitly convey a false impression, are misleading in context, or [are] likely to deceive consumers. Besides actionable statements, a category of non-actionable statements exists. Many statements fall into this category, popularly known as puffery. Puffery exists in two general forms: (1) exaggerated statements of bluster or boast upon which no reasonable consumer would rely; and (2) vague or highly subjective claims of product superiority, including bald assertions of superiority.

Juxtaposed to puffery is a factual claim. A factual claim is a statement that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification. To be actionable, the statement must be a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact. Generally, opinions are not actionable.

Puffery and statements of fact are mutually exclusive. If a statement is a specific, measurable claim or can be reasonably interpreted as being a factual claim, i.e., one capable of verification, the statement is one of fact. Conversely, if the statement is not specific and measurable, and cannot be reasonably interpreted as providing a benchmark by which the veracity of the statement can be ascertained, the statement constitutes puffery. Defining puffery broadly provides advertisers and manufacturers considerable leeway to craft their statements, allowing the free market to hold advertisers and manufacturers accountable for their statements, ensuring vigorous competition, and protecting legitimate commercial speech.

*Am. Italian Pasta,* 371 F.3d at 390–91 (alterations in original) (internal quotation marks and citations omitted); *see also United Indus. Corp.,* 140 F.3d at 1180 (noting that puffery does not include "false descriptions of specific or absolute characteristics of a product and specific, measurable claims of product superiority").

Home Show challenges statements, which include (1) "QCFSBO is the #1 FSBO destination in the QCA"; (2) "QCFSBO is the one and only 100% FSBO website of the Quad Cities"; and (3) "[QCFSBO has] the best exposure in the QCA"; (QC App. 45). Home Show also challenges representations of Home Show as "the No. 2 website."

■ There are two types of comparative advertising claims under the Lanham Act: "(1) 'my product is better than yours' and (2) 'tests prove that my product is better than yours.' When challenging a claim of superiority that does not make express reference to testing, a plaintiff must prove that the defendant's claim of superiority is actually false, not simply unproven or unsubstantiated." *United Indus. Corp.,* 140 F.3d at 1181–82 (internal citations omitted).

■ The challenged statements are claims of superiority that do not express reference to testing. Thus, to maintain a claim under the Lanham Act, Home Show must demonstrate that the statements on QCFSBO's website are actually false. *See id.; see also Am. Italian Pasta,* 371 F.3d at 390–91 (concluding that as a matter of law, the term, "America's favorite pasta," viewed standing alone or in context, is not "a specific, measurable claim and cannot be reasonably interpreted as an objective fact" because it relies on "numerous characteristics, many of which may be intrinsic" and is, therefore, merely a term of superiority, and not a verifiable statement of fact).

When asked whether the statements on QCFSBO's website were false, Vavrosky said they were "not accurate." QCFSBO's App. 32–63.

Q: Are there any statements on [Exhibit A, page 6 of 19] that you contend are false?

A: I would probably say that [']the number one FSBO destination in the QCA['] is not an accurate statement.

Q: How do you know that?

A: How do they know that they are number one?

Q: Well, Mr. Vavrosky, this is your lawsuit, and so you're the one with the burden of proof. How do you know that they are not the number one for-sale-by-owner destination in the Quad Cities area?

A: Well, how do I factually know?

Q: Yes.

A: I'd have to get back to you on that. I'd have to refer back to more information.

. . . .

Q: As we sit here today, looking at this printout which is what's been filed in the Federal District Court, you can't point to any *statement that it* [sic] false on page 6 of 19?

A: With the difficulty of reading this, I can tell you things that I don't approve of. I can't give you a factual answer, because it is difficult to read some of this. There are statements here that I don't agree with, that are untrue or unproven as stated on the page.

Q: Okay. What's untrue?

A: Best exposure in the QCA I would disagree with.

Q: Why?

A: How can it be the best exposure in the QCA when other sites are doing just as well for other clientele?

Q: How do you know other sites are doing just as well?

A: Because I own a Web site that does just as well.

Q: How do you know it does just as well?

A: Because we sell a lot of properties as well.

Q: Do you know that you sell more properties?

A: I know I have sold more properties in certain instances, in certain locations.

Q: In what locations have you sold more properties?

A: In Illinois.

Q: How do you know that?

A: Because of my database, because of my information that I collect. Q: Is the word Illinois on this page anywhere?

A: I don't see it.

. . . .

Q: What information do you have to prove that the statements on this page are false?

A: The only information I can give you is collected through our database

between the weeks in 2007 and this listing response. I would have to go back and look at the exact date, exact time and the amount of properties that they say we sold and the amount that we actually did.

Q: But you would have to go back and look at your database to do that?

A: In order to verify the statistics.

Q: But as we sit here today, you can't do that?

A: I can tell you that I didn't agree with it, which means I did check it and it was inaccurate, and that's why this page is part of the Complaint.

Vavrosky Dep., QCFSBO's App. 44–45, ECF No. 37–3. Vavrosky gave similar responses when asked about the other screenshots contained in Exhibit A. Home Show never supplemented the record to follow up on those questions to which Vavrosky responded, "I'd have to get back to you on that." *Id.*

Nothing in Vavrosky's testimony demonstrates that the statements contained on QCFSBO's website were actually false, rather Vavrosky's testimony merely demonstrates Home Show's subjective disagreement with those statements. Similarly, Home Show's annotations of "untrue" and "unproven," found on the screenshots contained in Exhibit A, amount to unsupported allegations of falsity or disagreement and simply do not generate a genuine issue of material fact to defeat summary judgment on a Lanham Act claim. *See United Indus. Corp.,* 140 F.3d at 1181–82.

Furthermore, most of QCFSBO's statements of superiority in the Quad Cities' FSBO real estate market contain various qualifiers, such as, (1) "QCFSBO is the # 1 FSBO *destination* in the QCA"; (2) "QCFSBO is the one and only *100% FSBO* website of the Quad Cities," and (3) "[QCFSBO has] the *best exposure* in the QCA." Ex. A, Second Am. Compl., ECF No. 28–1. Although Home Show asserts that QCFSBO's statements are "too targeted, mathematical and precise" to constitute mere puffery, Home Show offers no evidence that these statements are anything more than "vague or highly subjective claims of product superiority" or "bald assertions of superiority." *Am. Italian Pasta,* 371 F.3d at 390. Accordingly, because QCFSBO does not contend its statements of superiority are based upon studies or other empirical data, the Court finds they constitute nothing more than mere puffery, and are not actionable under the Lanham Act. *See Ideal Instruments, Inc. v. Rivard Instruments, Inc.,* 479 F.Supp.2d 968, 986 (N.D.Iowa 2007) (finding that a Lanham Act false advertising claim must "first and foremost, be based on a factual statement"); *see also Am. Italian Pasta,* 371 F.3d at 392–93 (agreeing with the Seventh Circuit Court of Appeals' conclusions in *Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883 (7th Cir.), *opinion amended on denial of reh'g,* 209 F.3d 1032 (7th Cir.2000), that "[t]o allow a consumer survey to determine a claim's benchmark would subject any advertisement or promotional statement to numerous variables, often unpredictable, and would introduce even more uncertainty into the market place").[12]

---

**12.** Home Show's final argument is that because Banerjee admits to calculation inaccuracies in preparing her graphs, QCFSBO's claims are predicated on error and therefore necessarily false. Pl.'s Resp. Br. 8. Read in its entirety, Banerjee's testimony indicates that the calculation errors contained in QCFSBO's graphs actually *favored* Home Show:

Q: And is it your testimony that the information both for QCFSBO and the No. 2 websites being [ ] Home Show, is accurate as stated on this [web] page?

Furthermore, assuming *arguendo* that QCFSBO's statements were statements of fact, Home Show's claim under the Lanham Act nonetheless fails because Home Show has provided no evidence to generate a fact issue that any of the challenged statements "actually deceived or had the tendency to deceive a substantial segment of its audience." *Blue Dane Simmental Corp. v. Am. Simmental Ass'n,* 178 F.3d 1035, 1042 (8th Cir.1999) (reasoning that "to recover money damages under the [Lanham] Act, a [p]laintiff must prove both actual damages and a causal link between defendant's violation and those damages," and concluding that the plaintiff's Lanham Act claim failed as a matter of law because the plaintiff did not demonstrate that the defendant's "actions caused even one dealer to switch from [the plaintiff's company] to a competing company, led any dealer to reduce its business with [the plaintiff] or otherwise caused [the plaintiff] any damage or injury") (second alteration in original) (quotations omitted).

For the reasons stated, QCFSBO is entitled to summary judgment on Home Show's Lanham Act claim.

## 2. Defamation Claims

QCFSBO asserts that it is entitled to summary judgment on Home Show's libel claims because Home Show has failed to meet its burden of showing the claims were published with actual malice. Home Show resists arguing evidence in the record demonstrates that "Home Show is the target of many insidious and inaccurate comments on QCFSBO" that "are *libelous per se.*" Pl.'s Resp. Br. 9, ECF No. 49–1.

"Defamation involves the publication of written or oral statements which tend to injure a person's reputation and good name." *Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 418 (Iowa 1997). Defamation involves the twin torts of libel and slander. *Theisen v. Covenant Med. Ctr. Inc.,* 636 N.W.2d 74, 83 (Iowa 2001) (citing *Lara v. Thomas,* 512 N.W.2d 777, 785 (Iowa 1994)). "Libel is generally a written publication of defamatory matter, and slander is generally an oral publication of such matter." *Yates v. Iowa W. Racing Ass'n,* 721 N.W.2d 762, 768 (Iowa 2006) (quoting *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 221 (Iowa 1998)).

> A: When we redid [sic] the numbers, I noticed that I had made some errors, and the correct numbers are all provided in the discovery.
>
> Q: All right. So this was not accurate?
>
> A: There are some errors, yes. I realized I made some errors. I used a faulty way of calculating that, ours primarily. And so when I had went [sic] over that again, we made sure that the information—correct information and quadruple checked information was sent into you via discovery.
>
> Q: Those errors that occurred, did that make it look as though or indicate as though QCFSBO had more or less listings than— more or less listings than QC Home Show?
> .... (Reporter had to read the pending question)
>
> A: For the most part, it was accurate. There are some where we went over, and there were some where we went considerably under what we actually had.
>
> Q: (By Mr. Zmuda) Okay. But those errors favored, if you will, QCFSBO as opposed to QC Home Show, meaning it made it look like QCFSBO had more listings on a regular basis than QCFSBO Home Show?
>
> A: Actually, the errors in most cases benefitted him, benefitted QC Home Show. Additionally, when I counted the No. 2 website information, I realized I previously had also counted the realtor, the new listed properties that were actually realtor listed.
>
> Q: So—
>
> A: Again, benefitting Mr. Vavrosky.
>
> Q: So, had you understated, for example, any of QCFSBO's listing numbers in this document?
>
> A: I did understate.
>
> Q: Yes?
>
> A: Yes, I did actually. The information is in the discovery.
>
> Banerjee Dep., Home Show App. 75–77, ECF No. 51–1.

There are two types of libel: libel per se and libel per quod. *Schlegel,* 585 N.W.2d at 222.

### a. Libel Per Se

 "An attack on the integrity and moral character of a party is libelous per se." *Vinson v. Linn–Mar Cmty. Sch. Dist.,* 360 N.W.2d 108, 116 (Iowa 1984). "If a statement is clear and unambiguous, the issue of whether the statement is libelous per se is for the court. If the court determines a statement is libelous per se as a matter of law, the burden shifts to the defendant to prove the statement was used and understood in a different sense." *Kiesau v. Bantz,* 686 N.W.2d 164, 175 (Iowa 2004) (citations omitted).

> In determining whether language is libelous per se, it must be viewed stripped of any pleaded innuendo. The meaning of the phrase 'per se' is 'taken alone, in itself, by itself.' Words which are libelous per se do not need an innuendo, and, conversely, words which need an innuendo are not libelous per se.

*Shaw Cleaners & Dyers v. Des Moines Dress Club,* 215 Iowa 1130, 245 N.W. 231, 233 (1932); *Ragland v. Household Fin. Corp.,* 254 Iowa 976, 119 N.W.2d 788, 790 (1963) (citations omitted) ("The determination of whether a publication is libelous per se is for the court in the first instance. This determination is made by reference to the statements made, without reference to the defamatory sense in which plaintiff claims such statements were intended and understood."). If a defendant's statement is found to be libelous per se, damage to reputation is presumed. *Schlegel,* 585 N.W.2d at 222.

 "[S]ome statements are defamatory per se; that is, they are of such a nature that the court can presume as a matter of law that their publication will have a defamatory effect, even without a showing by the plaintiff of malice, falsity,

or damage." *Kerndt,* 558 N.W.2d at 418. Statements qualifying as libel per se have been described in four general categories: "imputation of (1) certain indictable crimes, (2) loathsome disease, (3) incompetence in occupation, and (4) unchastity." *Barreca v. Nickolas,* 683 N.W.2d 111, 116 (Iowa 2004) (citing, in parenthetical, Patrick J. McNulty, *The Law of Defamation: A Primer for the Iowa Practitioner,* 44 Drake L.Rev. 639, 650–52 (1996)).

Home Show argues that QCFSBO's statement regarding Home Show falsifying its origination date constitutes libel per se. The statement, in pertinent part, says "there are companies in the QCA who are boldly falsifying public records .... [by] declaring on its website and radio ads that they have been 'successfully helping Quad City sellers advertise their property for sale' since 1999 .... [but this] website did not exist in 1999! The domain name was not registered until April 28, 2000 and the website was launched long after that." Ex. A, Second Am. Compl., ECF No. 28–1; *see also* discussion *supra* Part II.B.8.d.

 By Home Show's own admission, this statement is not false. Vavrosky testified that he did not launch a FSBO website until 2000 and did not incorporate as QuadCityHomeShow.com until 2004. Furthermore, the statement does not fall into the category of an "imputation of (1) certain indictable crimes, (2) loathsome disease, (3) incompetence in occupation, and (4) unchastity," and therefore does not constitute libel per se. *Barreca,* 683 N.W.2d at 116.

### b. Libel Per Quod

Home Show alternatively argues that if this statement does not constitute libel per se, "a finding of libel per quod is nonetheless warranted." Pl.'s Resp. Br. 12, ECF No. 49–1. Home Show asserts that the statement regarding falsifying records

"could only be perceived by viewers as statements of fact" and that "at the very least, a material question of fact exists for a jury as to whether such statements amount to libel per quod." *Id.* Home Show also asserts that QCFSBO's statements [13] conveying the message that customers suffer by using home-based or one-person operated FSBOs are libelous.

"A statement is libelous per quod if it is necessary to refer to facts or circumstances beyond the words actually used to establish the defamation." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). To sustain an action for defamation based on libel per quod, a plaintiff must be able to prove some cognizable injury, such as injury to reputation. *Kiesau*, 686 N.W.2d at 175. In an action based on libel per quod, a plaintiff must show damage other than just hurt feelings. *Id.; Schlegel*, 585 N.W.2d at 222 ("In case of statements that are not libelous per se but libelous per quod, this means a plaintiff must first prove actual damage to reputation before the plaintiff can recover for mental anguish or hurt feelings.").

To demonstrate a prima facie case of libel per quod, Home Show must show (1) QCFSBO published a statement; (2) the statement was defamatory; (3) the statement was "of and concerning" the plaintiff; and (4) the statement resulted in injury to the plaintiff. *Schlegel*, 585 N.W.2d at 221.

To prove defamation, the plaintiff ordinarily must show the statements "were made with malice, were false, and caused damage." *Id.* Substantial truth is a complete defense to a defamation action. *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987). "[A] libel defendant is not required to establish the literal truth of the publication in every detail as long as the 'sting' or 'gist' of the defamatory charge is substantially true." *Id.* "The gist or sting of the defamatory charge, according to one court, is 'the heart of the matter in question—the hurtfulness of the utterance.'" *Id.* (quoting *Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir.1987)). "If the underlying facts as to the gist or sting of the defamatory charge are undisputed, the court may determine substantial truth as a matter of law." *Id.*

The Iowa Supreme Court has adopted the following four-factor test for the trial court to use in determining whether the challenged statement is defamatory: (1) "the precision and specificity of the disputed statement"; (2) "'the degree to which the [alleged defamatory] statements are . . . objectively capable of proof or disproof [ ]'"; (3) "the context in which the alleged defamatory statement occurs"; and (4) "'the broader social context into which [the alleged defamatory] statement fits.'" *Yates*, 721 N.W.2d at 771–72 (quoting *Jones v. Palmer Commc'n, Inc.*, 440 N.W.2d 884, 891–92 (Iowa 1989), *overruled on other grounds by Schlegel*, 585 N.W.2d at 224).

"A trial court's initial task in a defamation action is to decide whether the challenged statement is 'capable of bearing a particular meaning, and whether that meaning is defamatory.'" *Yates*, 721 N.W.2d at 771–72 (quoting Restatement (Second) of Torts § 614(1)).

In carrying out this task, a court should not, however, "indulge far-fetched interpretations of the challenged publication. The statements at issue 'should . . . be construed as the average or common mind would naturally understand [them].' If the court determines that a

---

**13.** The referenced statements are found on page eight of Exhibit A. *See* Second Am. Compl., Ex. A, ECF No. 28–1; *see also* discussion *supra* Part II.B.4.b–d.

statement is indeed capable of bearing a defamatory meaning, then whether that statement is in fact 'defamatory and false [is a question] of fact to be resolved by the jury.'"

*Id.* at 772 (quoting *Guilford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 594 (D.C.2000) (internal citation omitted in original)).

The Iowa Supreme Court has "adopted the view espoused in Restatement (Second) of Torts, section 581A comment *f,* that if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation." *Id.* at 768–69 (internal quotation omitted). Comment *f* states, in pertinent part, "many charges are made in terms that are accepted by their recipients in a popular rather than a technical sense. . . . It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance." Restatement (Second) of Torts § 581A cmt. f (1977).

 Home Show has failed to make a prima facie case of libel per quod. *Schlegel,* 585 N.W.2d at 221. Although the published statement element is satisfied, Home Show has not demonstrated that the statements were defamatory, "of and concerning" the Plaintiff, or resulted in injury to the Plaintiff. *Id.* Similar to the statement regarding Home Show's origination date, the statement regarding one-person, home-based operations is substantially true. Vavrosky admitted that he is Home Show's sole employee and operates Home Show out of his home:

Q: Who are the officers of Home Show Tours, Inc.

A: Me, myself, and I.

. . . .

Q: Does Home Show Tours or any of its d/b/a's [sic] have any employees?

A: Just me.

Q: Does it have a physical address?

A: My office is at my home location.

Q: So your office address and your home address are the same?

A: Correct.

Q: You don't have any employees?

A: No.

Vavrosky Dep., QCFSBO's App. 34, ECF No. 37–3. Vavrosky also admitted that he did not buy the QuadCityHomeShow.com domain until 2000 and did not incorporate as Home Show Tours until 2004. Accordingly, because QCFSBO's statements are substantially true, Home Show cannot maintain its libel per quod claim. *See Behr,* 414 N.W.2d at 342.

In addition, Home Show has failed to produce any evidence of damages. Home Show submits customers' letters informing Home Show that they were going to use the "other" website. Customer Letters, Home Show's App. 92–99, ECF No. 51–2. However, the letters all indicate the customers were switching websites because they had not achieved results through Home Show's website; the letters provide no indication that the statements on QCFSBO's website influenced those decisions. Additionally, Vavrosky testified that he could not identify any specific individuals that did not hire Home Show as a result of any of the allegations in the Second Amended Complaint:

Q: Can you identify any specific customers that have left Home Show Tours and gone to QCFSBO as a result of any allegations you've made in your Complaint?

A: Not at this time.

Q: Can you identify any specific individuals that did not hire Home Show Tours as a result of any of the

allegations you made in this complaint?

A: The allegations I've made, no not at this time.

Vavrosky Dep., QCFSBO's App. 61, ECF No. 37–3. Home Show never supplemented the record.

Home Show also asserts "[a]s for damages, Home Show experienced harm to its reputation from the misrepresentation on QCFSBO's website, and it also saw a major decline in revenues." Pl.'s Resp. Br. 13, ECF No. 49–1. At Home Show's request, Certified Public Accountant Wendy Wassell–Verschoore (the CPA) compiled a report based upon Home Show's tax returns from 2004 through 2009, showing, in pertinent part, that in gross receipts, Home Show experienced a slight but steady increase from 2005 through 2007, a notable decline in 2008, and a rebound in 2009. The CPA's report included the disclaimer that she made "no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose." CPA report, QCFSBO's App. 95, ECF No. 37–3. Even accepting the contents of the CPA's report as true, it does not create a fact issue of a nexus between QCFSBO's statements and Home Show's 2008 decline in revenue.[14] In addition, Vavrosky could not identify anyone that withdrew or failed to hire Home Show *as a result* of QCFSBO's statements. *See* Vavrosky Dep., QCFSBO's App. 58–59, ECF No. 37–3. ("Q: Identify each person that has not hired [Home Show] as a result of the statements on this page. A: I do not have any names at this time…. Q: Again,

identify each person that has been misled or has talked to you about these false statements. A: I cannot give you any names at this time."). Again, Home Show did not supplement the record with evidence of damages. *See Schlegel*, 585 N.W.2d at 224 ("To recover in an action for defamation, a plaintiff must ordinarily prove some sort of cognizable injury, such as an injury to reputation. Hurt feelings alone cannot serve as the basis of a defamation action." (quoting *Johnson*, 542 N.W.2d at 513)).

For these reasons, Home Show has failed to satisfy the required elements for a prima facie showing of libel per quod.

### 3. False Light Claim

Home Show bases its false light claim on the same statements as its libel claims and asserts summary judgment is inappropriate because a reasonable person would find QCFSBO's accusations about Home Show offensive.

■ "A·claim for false light invasion of privacy is based upon an untruthful publication which places a person before the public in a manner that would be highly offensive to a reasonable person." *Willson v. City of Des Moines*, 386 N.W.2d 76, 83 n. 8 (Iowa 1986). In defining the tort of false light, Iowa has adopted the Restatement (Second) of Torts § 652E, *see id.*, which states,

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

---

14. It is axiomatic that any small business is subject to reduced revenue during any period due to any number of factors. Furthermore, in 2008, a decline in revenue in the real estate market was not unique to Home Show or even the Quad Cities Area; rather, there was a much publicized national economic crisis

that resulted in an industry-wide drop in home sales. *See, e.g., Real Estate Facts and Trends for Quad Cities*, Ruhl & Ruhl Realtors (Spring 2009), http://issuu.com/schwind007–/docs/real_estate_facts__trends_-_spring_2009_-_schwind.

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

The tort of false light "overlaps the law of defamation," *Winegard v. Larsen,* 260 N.W.2d 816, 823 (Iowa 1977), and therefore requires proof of untruthfulness, however the plaintiff need not prove that he was defamed, *see McFarland v. McFarland,* 684 F.Supp.2d 1073, 1093 (N.D.Iowa 2010). "Even when deliberately false statements are made, they are not actionable under the false light theory unless they are material and substantial." *Winegard,* 260 N.W.2d at 823.

One who has established a cause of action for invasion of his privacy is entitled to recover damages for

(a) the harm to his interest in privacy resulting from the invasion;

(b) his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion; and

(c) special damage of which the invasion is a legal cause.

*Kish v. Iowa Cent. Cmty. Coll.,* 142 F.Supp.2d 1084, 1100 (N.D.Iowa 2001) (quoting Restatement (Second) of Torts § 652H (1977)) (noting that because the Iowa Supreme Court has adopted the principles of invasion of privacy as set forth in Restatement (Second) of Torts, the applicable standard for damages as a result of that tort would also be found in the Restatement).

■■■■ As with its libel claims, Home Show has failed to show the untruthfulness of the statements contained on QCFSBO's website or that Home Show was damaged by those statements. *See id.* (applying Iowa law and finding that the plaintiff failed to generate a genuine issue of material fact on the essential element of damages, and therefore defendant was entitled to summary judgment on plaintiff's false light claim). Again, Home Show has failed to go beyond the pleadings or its own deposition statements and therefore has failed to demonstrate there are genuine issues of material fact that preclude summary judgment. *See id.; Chapman v. Labone,* 460 F.Supp.2d 989, 1007 (S.D.Iowa 2006) (applying Iowa law and concluding the plaintiff's false light claim failed as a matter of law, as had the plaintiff's defamation claim, because the plaintiff failed to show the defendant knew the statement was false or that the defendant acted recklessly or knowingly regarding the falsity of the statement).

## C. Intentional Interference with Contract Claims

QCFSBO argues it is entitled to summary judgment on Home Show's intentional interference claims because the challenged conduct—QCFSBO's contract with Clear Channel—is based upon a legal relationship between QCFSBO and Clear Channel and that contract was not entered into interfere with Home Show. Home Show contends QCFSBO's conduct was improperly calculated to cause Home Show to lose business.

### 1. Interference with Existing Business Relationship

■■■■ To recover for intentional interference with an existing contract, a plaintiff must show

(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

*Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008) (quoting *Green v. Racing Ass'n of Cent. Iowa*, 713 N.W.2d 234, 243 (Iowa 2006)).

> In determining whether QCFSBO's conduct is improper, the following factors are relevant: "(a) the nature of the act or conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties."

*Jones v. Lake Park Care Ctr. Inc.*, 569 N.W.2d 369, 377 (Iowa 1997) (quoting *Hunter v. Bd. of Trs.*, 481 N.W.2d 510, 518 (Iowa 1992)).

The Iowa Supreme Court has also observed,

> In determining whether the interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

*Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996).

QCFSBO's sponsorship package with Clear Channel rendered QCFSBO the exclusive right to advertise during certain radio programs. Home Show admits that it did not have an exclusive sponsorship package with Clear Channel at the time QCFSBO entered into the Clear Channel sponsorship package. An email dated November 6, 2008, from Jeff Ashcraft (Ashcraft) of Clear Channel responding to Vavrosky's complaint about not being able to advertise during the QCFSBO-sponsored broadcasts provides no evidence that QCFSBO and Clear Channel in any way entered into the exclusive sponsorship package to interfere with Home Show:

> It's clear you are frustrated, and I apologize for your dissatisfaction; however, I'll try and explain the company policy to help you better understand.
>
> When a client specifically purchases a sponsorship of a [sic] one our syndicated programs, like Bob Kingsley's Country Countdown, part of the agreement is that they have exclusive sponsorship within their industry category for the duration of that agreement. The sponsorship includes the spots which run during the program, and the promotional sponsorship liners we run during the week.
>
> This past summer we were in error in providing you added value during the Kingsley show. Therefore since we already have a sponsor of the Kingsley show within your same industry, they will continue to have exclusive sponsorship during their agreement, and will also retain a first [right] of refusal at the agreement's conclusion.
>
> We certainly apologize for the confusion; however this is the company policy now and in the future. I hope we can work through this challenge and provide you with alternatives which will meet you [sic] needs.

Ashcraft email of Nov. 6, 2008, Home Show App. 85, ECF No. 51–2.

■ Ashcraft's Nov. 6 email demonstrates that Home Show, not QCFSBO, contacted Clear Channel about the con-

tractual relationship between QCFSBO and Clear Channel. There is no evidence, however, that QCFSBO contacted Clear Channel regarding an existing contractual relationship between Home Show and Clear Channel. Furthermore, Home Show has presented no evidence other than Vavrosky's speculation that QCFSBO entered into the sponsorship contract with Clear Channel to interfere with Home Show. As Ashcraft explained, Clear Channel's exclusivity provision is Clear Channel's company policy for all exclusive sponsorship packages and was not unique to QCFSBO's contract with Clear Channel. Vavrosky admitted that Home Show was free to advertise at other broadcast times on other Clear Channel radio stations. *See* Vavrosky Dep., QCFSBO's App. 60, ECF No. 37–3 ("Q: You were no longer allowed to advertise during Sunday mornings on [Country Countdown] show? A: Correct. Q: Would you have been allowed to advertise on one of [Clear Channel's] other radio stations? A: Sure.").

Moreover, merely showing interference with a contractual relationship between Home Show and Clear Channel would not have been enough; Home Show needed to demonstrate the interference was *improper*. *See Books Are Fun, Ltd. v. Rosebrough,* No. 4:05–cv–00644–JEG, 2006 WL 2583717, at *8 (S.D.Iowa Sept. 6, 2006) ("[I]ncidental damages resulting from a defendant's pursuit of its own competitive interests do not necessarily lead to the conclusion that intentional interference was also improper.").

Additionally, Home Show's claim fails because Home Show has not demonstrated that it was damaged as a result of the alleged interference.

Home Show has failed to demonstrate a prima facie case of intentional interference with contractual relationship, and therefore QCFSBO is entitled to summary judg-

ment on this claim. *See Kern,* 757 N.W.2d at 662.

### 2. Interference with Prospective Business Relationship

QCFSBO also moves for summary judgment on Home Show's claim that QCFSBO intentionally interfered with Home Show's prospective business relationship with Clear Channel "by insisting that Clear Channel prohibit [Home Show] from advertising during times and programs in which QCFSBO advertises." Second Am. Compl. 5, ECF No. 28.

■ To prevail on this claim, Home Show must demonstrate that (1) Home Show had a prospective contractual or business relationship with Clear Channel, (2) QCFSBO knew of the prospective relationship, (3) QCFSBO intentionally and improperly interfered with the relationship by insisting Clear Channel prohibit Home Show from advertising during times and programs in which QCFSBO advertises, (4) the interference caused Clear Channel not to enter into or continue the relationship or that the interference prevented the Home Show from entering or continuing the relationship; and (5) the amount of damage. *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 198–99 (Iowa 1990). "In a claim of interference with a prospective business advantage, the 'purpose on the defendant's part to financially injure or destroy the plaintiff is essential.'" *Id.* (quoting *Page Cnty. Appliance Ctr. v. Honeywell,* 347 N.W.2d 171, 177 (Iowa 1984)).

■ As discussed in regard to Home Show's intentional interference with existing business relationship claim, Home Show has failed to create any inference of an improper purpose and damages, which are also elements of intentional interference with prospective business relationship claim. In addition, Home Show has produced no evidence to generate a factual

dispute that QCFSBO entered into or maintained an exclusive sponsorship package with Clear Channel for the *purpose* of financially injuring or destroying Home Show, which is necessary to maintain an interference with prospective business relationship claim. Accordingly, Home Show's intentional interference with prospective business relations claim also fails as a matter of law. *Id.*

### D. Antitrust Violation

QCFSBO and Symmetry move for summary judgment on Home Show's antitrust claim arguing Home Show has failed to show that any agreement between QCFSBO and Symmetry was anti-competitive or that Home Show suffered any damages as a result of these alleged violations. Home Show resists arguing that a number of issues give rise to issues of material fact with respect to whether QCFSBO and Symmetry have engaged in violations of the Sherman Act, including (1) the relationship between QCFSBO and Symmetry, (2) their exclusive referral agreement, (3) QCFSBO's exclusive customer contract, and (4) QCFSBO's motivations in operating under such agreements.

"Under [the Sherman] Act, it is unlawful to contract or form a conspiracy 'in restraint of trade or commerce among the several States,' 15 U.S.C. § 1, or to 'monopolize or attempt to monopolize ... any part of the trade or commerce among the several States,' 15 U.S.C. § 2." *Little Rock Cardiology Clinic PA v. Baptist Health,* 591 F.3d 591, 596 (8th Cir.2009).

■■■ "It is axiomatic that the antitrust laws were passed for the protection of *competition,* not *competitors.* Disappointment at not receiving [a specific hoped-for contract] is insufficient as a matter of law to rise to the level of an antitrust violation within a relevant market." *Double D*

*Spotting Serv., Inc. v. Supervalu, Inc.,* 136 F.3d 554, 561 (8th Cir.1998) (internal quotation marks and citation omitted).

■■■ Section 1 of the Sherman Act, in pertinent part, provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. However, section 1 is "intended to prohibit only unreasonable restraints of trade." *Nitro Distrib., Inc. v. Alticor, Inc.,* 565 F.3d 417, 423 (8th Cir.2009) (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)). "The burden of proving the unreasonableness of a restraint lies with the plaintiff." *Craftsmen Limousine, Inc. v. Ford Motor Co. (Craftsmen II),* 491 F.3d 380, 386 (8th Cir.2007).

"The United States Supreme Court has set forth three methods for analyzing the reasonableness of a restraint on trade: rule of reason analysis, per se analysis, and quick look analysis.... The rule of reason is the 'prevailing standard' for determining a restraint's effect upon competition in a relevant market." *Craftsmen Limousine, Inc. v. Ford Motor Co. (Craftsmen I),* 363 F.3d 761, 772–73 (8th Cir.2004) (citing *Cont'l T.V. Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)); *Bus. Elecs. Corp.,* 485 U.S. at 726, 108 S.Ct. 1515 ("[T]here is a presumption in favor of a rule-of-reason standard"); *State Oil Co. v. Khan,* 522 U.S. 3, 22, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("[T]he majority of commercial arrangements subject to the antitrust laws [ ] should be evaluated under the rule of reason"). In this case, the Court uses the "rule of reason" test to determine whether the restraint of trade was unreasonable.[15] "Under this ap-

---

**15.** Home Show concedes that the "per se" mode of analysis does not apply in this case.

*See Craftsmen I,* 363 F.3d at 773 ("When a

proach, 'the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.' " *Id.* (quoting *State Oil Co.*, 522 U.S. at 10, 118 S.Ct. 275.)

■ Home Show bears the burden of ultimately demonstrating "an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir.2000) (internal quotation omitted).

### 1. An Agreement

Home Show argues that because "QCFSBO is the number one for sale by owner website in the Quad City area," together with "the exclusive [QCFSBO–Sym] referral agreement has the effect of channeling increasing numbers of clients toward Symmetry, and consequently depriving greater numbers of property owners of the information they need to make a free choice." Pl.'s Resp. Br. 9, ECF No. 50–3. Home Show further asserts the QCFSBO and Symmetry relationship, which includes an exclusive advertising agreement, shared building tenancy, and Symmetry providing QCFSBO access to the MLS listing, confers an anticompetitive advantage upon QCFSBO. Home Show maintains that this advantage is demonstrated by Banerjee's testimony, which was based upon data generated by third-party software, that QCFSBO has

the greatest number of hits and adds more listings per week than any other FSBO website.

■ Despite Home Show's various assertions, it has not presented any evidence that any agreement between QCFSBO and Symmetry is anti-competitive. Home Show presents no legal authority for the proposition that an exclusive advertising agreement is illegal. To the contrary, such agreements are common. Nor does the fact that QCFSBO and Symmetry lease adjacent building space restrain trade. Further, undisputed testimony demonstrates that Symmetry provides mortgage services to non-QCFSBO customers and QCFSBO's customers use mortgage services other than Symmetry's. Even more apparent, however, is the absolute absence of evidence that Home Show was damaged as a result of QCFSBO and Symmetry's alleged practices. *See Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1495 (8th Cir.1992) (concluding that summary judgment in favor of the defendant on plaintiff's Sherman Act claim was properly granted because the plaintiff failed to establish the causal connection between its decline and the defendants' alleged antitrust violations and also failed to establish any reasonable basis for determining its damages).

### 2. Monopoly

■ "A prima facie claim of monopolization under the Sherman Act requires [Home Show] to show that [QCFSBO] 'possessed monopoly power in the relevant market' and 'willfully acquired or maintained that power.' " *HDC Med., Inc. v.*

---

restraint's negative impact on competition is immediately discernable and the restraint has no redeeming virtue, the per se mode of analysis applies."); *see also Craftsmen II,* 491 F.3d at 387 ("Plaintiffs challenging restraints subject to the 'per se rule' enjoy the lightest burden of proving unreasonableness. Judi-

cial experience has proven certain types of restraints to be so strongly linked with anti-competitive activity, and their economic impact so immediately obvious, that we presume unreasonableness and deem them unlawful restraints of trade per se.").

*Minntech Corp.,* 474 F.3d 543, 547 (8th Cir.2007) (quoting *Amerinet,* 972 F.2d at 1490).

Even assuming Home Show had demonstrated that QCFSBO has a dominate market share, Home Show has presented no evidence that QCFSBO had the specific intent to monopolize or that there was an anti-competitive effect due to the QCFSBO–Sym Agreement. Home Show has shown no more than disappointment at not having a similarly exclusive relationship, which, as a matter of law, does not rise to the level of an antitrust violation. *See Double D,* 136 F.3d at 561. QCFSBO's conduct is undisputably competitive; however, the Sherman Act does not insulate competitors from all competition, only unfair competition. *See Mayer Hoffman McCann, P.C. v. Barton,* 614 F.3d 893, 909 (8th Cir.2010) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.") (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).

## III. CONCLUSION

For the reasons stated, QCFSBO's motion for summary judgment (ECF No. 37) and Symmetry's motion for summary judgment (ECF No. 42) must be **granted.** The above-entitled action is **dismissed.**

**IT IS SO ORDERED.**